# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| NATHANIEL HARSY, <br><br> *Plaintiff*, <br><br> v. <br><br> MID-AMERICAN APARTMENT COMMUNITIES, INC., MID-AMERICAN APARTMENTS, LP, AND MIDWAY SERVICES, INC. <br><br> *Defendants.* | Civil No. 1:17-cv-87 <br> Hon. Liam O'Grady <br> Hon. John F. Anderson |

## MEMORANDUM OPINION

*Pro se*[1] Plaintiff Nathanael Harsy has brought suit against Mid-American Apartment Communities, Inc., Mid-American Apartments, LP (together, "Mid-America"), and Midway Services, Inc. ("Midway") for violations of federal housing laws as well as various state tort claims. Both Defendants have separately moved to dismiss the complaint under Rule 12(b)(6). The matter has been fully briefed, and the Court found that oral argument was not necessary for the resolution of the case. For the reasons that follow, the Court hereby **GRANTS** both motions to dismiss. (Dkt. Nos. 20, 22).

### I. BACKGROUND

On August 22, 2014, Plaintiff began a one-year lease with Post Apartment Homes, L.P. ("Post") at an apartment located at 1201 South Joyce Street, Arlington, Virginia 22202. The apartment is called "Post Pentagon Row." Plaintiff alleges that Mid-America subsequently became the successor in liability to Post, and Defendants do not contest this allegation. During

---

[1] Mr. Harsy has notified the Court that he is now barred as an attorney in the state of Illinois. (Dkt. No. 19).

the relevant time period, either Post or Mid-America was responsible for the upkeep and management of Post Pentagon Row. Therefore, for the purposes of this Memorandum Opinion, Post and Mid-America are treated interchangeably.

There are a few other entities and individuals that must be identified before delving into the facts of the Complaint. First, Defendant Midway is a Florida Corporation that was hired to conduct routine maintenance of Post Pentagon Row. Second, "Hired Vendor" is an unknown company that was used by Midway to perform specific maintenance work on Plaintiff's apartment. Third, Mr. Blackman was the Property Manager of Post Pentagon Row. The Complaint alleges that these individuals and companies were subject to the FHA because they acted as employees and/or agents of Post.[2] Compl. ¶ 10.

On February 5, 2015, Plaintiff suffered a concussion. *See* Compl., Ex. 5. On March 27 and April 20, 2015, Plaintiff went to doctors to address the continued symptoms from this concussion. His symptoms included "migraines, headaches, anxiety, a short temper, sleeplessness, sound sensitivity, light sensitivity, problems concentrating, problems thinking, and a short attention span." Compl. ¶ 14. As a result of this brain injury, Plaintiff alleges that he was "supersensitive" and "had to quit a job at a law firm that had offered him full-time legal employment as a lawyer after law school, quit a job at a securities agency, stopped regularly attending class, and postponed taking the Bar Exam from July 2015 to July 2016 and was not able to be sworn into the Illinois Bar until March 2017." Compl. ¶ 16.

The dispute in this case centers on the date of April 15, 2017, when Hired Vendor entered Plaintiff's apartment without prior notice. At the time Hired Vendor entered the apartment, Plaintiff was undressed. Upon seeing Hired Vendor in his home, Plaintiff chased Hired Vendor

---

[2] Because Plaintiff's substantive claims do not have merit, the precise legal relationship between the parties is not explored in detail.

out of his apartment. Once outside the apartment, Hired Vendor began to yell at Plaintiff about his right to be in the apartment. Hired Vendor claimed that Plaintiff had been given notice of the maintenance work; however, due to an oversight in Defendants' notification procedures, Plaintiff had not actually been given notice. Plaintiff alleges that this intrusion into his dwelling caused "severe emotional distress triggering a fight-or-flight response, resulting in his brain physically aching because plaintiff reasonably believed he was having his apartment broken into causing plaintiff to reasonably fear for his life." Compl. ¶ 20.

After this incident, Plaintiff made Post aware that he was receiving medical treatment for a brain injury and that "anytime he is startled it causes him to suffer from severe emotional distress, causing his brain to physically ache." Compl. ¶ 24. In response, Post employees "giggled, snickered, and accused plaintiff of making up the fact he was not provided notice." *Id.* ¶ 27. Thereafter, Plaintiff confirmed that he was not provided notice by cross-checking a list in Post's possession.

At this time, Plaintiff told Post "they should not send their employees back to his apartment until next week to allow plaintiff to calm down from the previous unlawful entry." *Id.* ¶ 29. He also demanded that Post respect the 24-hour notice provision in his lease. Shortly after this conversation with Post employees, Plaintiff received a call from Manager Blackman, who told Plaintiff that Post could enter his apartment whenever he wanted, and that it did not need to provide notice. Blackman then offered Plaintiff a restaurant gift card, which Plaintiff refused because it "hurt his head to think of what the local restaurants" were. *Id.* ¶ 34.

Plaintiff alleges that one of three things happened after that conversation: (1) Blackman directed the Hired Vendor to return to Plaintiff's apartment; (2) Blackman failed to inform the Hired Vendor not to return to Plaintiff's apartment until the following week; or (3) Blackman

informed the Hired Vendor not to return until the following week, and Hired Vendor returned anyway. In any case, Hired Vendor returned to Plaintiff's apartment a second and third time that same day. Hired Vendor did not enter the apartment again that day but, upon his return, Hired Vendor banged on the door and demanded entry. Plaintiff did not open the door, but instead told Hired Vendor to leave and not return for the rest of the week.

Shortly thereafter, Plaintiff left his apartment. Hired Vendor allegedly saw him leaving and then rode the elevator down to the first floor with Plaintiff, verbally berating him the whole way. When the elevator reached the bottom, Hired Vendor did not get off. This gave Plaintiff the impression that Hired Vendor had ridden the elevator just to make fun of Plaintiff. When Plaintiff returned to his apartment later that same day, he emailed Blackman and requested in writing that he be left alone until the following week. Blackman acknowledged and agreed to this request via email. Notwithstanding these emails, Hired Vendor again banged on his door that afternoon, demanded entry, and said negative and threatening comments to Plaintiff.

The following week, Hired Vendor performed the routine maintenance in Plaintiff's apartment. The day after the maintenance, someone came by Plaintiff's apartment again and banged on his door. Plaintiff states that he thought it was the Hired Vendor at the door because the repairman had informed Plaintiff that sometimes they leave tools in people's apartments. Plaintiff did not answer the door.

Plaintiff's apartment was located across the hallway from a trash room, and when the trash room closed, it rattled Plaintiff's door. After the incident with Hired Vendor, Plaintiff alleges that every time the garbage room door closed, he suffered "severe emotional distress resulting in a fight or flight response in plaintiff from the fear that his apartment was being

broken into again." Compl. ¶ 43. As a result of these grievances, Plaintiff requested that he be able to terminate his lease before it expired. Mid-American refused this request.

Plaintiff filed his original complaint on January 23, 2017. On March 29 and 30, 2017, Defendants filed two separate motions to dismiss. Plaintiff responded by amending his Complaint as a matter of right under Rule 15. The Amended Complaint now alleges 10 counts against Defendants, jointly and severally; they are: (1) Federal Housing Act ("FHA") discrimination; (2) FHA retaliation; (3) FHA hostile environment harassment; (4) intentional infliction of emotional distress; (5) negligent infliction of emotional distress; (6) negligence; (7) abuse of access/trespass; (8) breach of the implied covenant of quiet enjoyment; (9) nuisance in fact; and (10) invasion of privacy.

## II. LEGAL STANDARD

Courts have a duty to liberally construe *pro se* litigants' pleadings, however, *pro se* complaints must nevertheless allege a cause of action. *Bracey v. Buchanan*, 55 F. Supp. 2d 416, 421 (E.D. Va. 1999).[3] In considering any motion to dismiss, the Court accepts as true all of the factual allegations contained in the complaint, construing them in the light most favorable to the plaintiff. *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014). To defeat the motion, the plaintiff must allege enough allegations of fact "to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In this regard, bald legal assertions without factual support need not be accepted. *Id.* Indeed, the Court may not rely on mere "labels and conclusions" or the complaint's "formulaic recitation of the elements of a given cause of action in deciding the motion. *Id.* at 555. In conducting its analysis, the Court may take judicial notice of matters of

---
[3] Because Plaintiff is also a licensed attorney, he is not entitled to the full force of the liberal pleading standards that are ordinarily afforded to *pro se* plaintiffs. *See Gordon v. Gutierrez*, No. 1:06-cv-861, 2006 WL 3760134, at *1 n.1 (E.D. Va. Dec. 14, 2006).

5

public record and may also consider documents attached to the complaint, "as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Sec'y of State For Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

### III. DISCUSSION

Plaintiff's allegations do not rise to the level of any cognizable cause of action. The thrust of Plaintiff's complaint are the FHA claims (Counts I, II, and III). These claims are addressed first, followed by a discussion of the seven remaining Virginia tort claims.[4]

Before proceeding to the individual claims, however, a brief note on the "eggshell plaintiff" principle is warranted. In arguing that he is entitled to relief, Plaintiff relies heavily on his "supersensitive status" and the "eggshell rule," which provides that a tortfeasor "takes the victim as he finds him." Compl. ¶ 15 (citing *Flood v. Smith*, 126 Conn. 644, 647 (Conn. 1940)). This time-tested principle of tort law holds true in Virginia but, as in other states, Virginia's "eggshell rule" only applies to the element of damages in tort cases. *See Bradner v. Mitchell*, 234 Va. 483, 489 (1987). Thus, in order for Plaintiff to benefit from the "eggshell rule," he must satisfy all other elements of the causes of action that he asserts. As discussed below, he fails to do so. This is because, unlike the "eggshell rule," Plaintiff's claims contain objective elements that are not satisfied by his "supersensitive status" or the allegations of fact in his Complaint.

#### A. Count I: FHA Discrimination

The FHA prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services of facilities with such a dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2). A handicap, in turn, is defined as "(1) a physical or mental impairment which substantially limits one or more of such person's major

---

[4] In addition to the substantive bases for dismissal, Midway asserts separate defenses under principles of agency law and the doctrine respondeat superior. *See* Reply Br. at 3–5 (Dkt. No. 27). Because the substance of the claims is wholly without merit, these alternative arguments are not addressed here.

6

life activities; (2) a record of having such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h).

For the purposes of the FHA, discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(b). The Agency's regulations provide two examples that add additional color to this statute. The first example notes that if a building had a "no pets" policy, but a blind tenant requested an accommodation for her seeing-eye dog, it would be unlawful to refuse that accommodation. 24 C.F.R. § 100.204(b). Similarly, if a mobility-impaired resident requested a parking space close to her apartment, it would be unlawful to deny that accommodation notwithstanding the apartment's usual first-come, first-served parking policy. *Id.*

"The FHA thus requires an accommodation for persons with handicaps if the accommodation is (1) reasonable and (2) necessary (3) to afford handicapped persons equal opportunity to use and enjoy housing." *Bryant Woods Inn, Inc. v. Howard Cty., Md.*, 124 F.3d 597, 603 (4th Cir. 1997). This court has previously explored this issue in *Matarese v. Archstone Pentagon City*, 761 F. Supp. 2d 346, 364 (E.D. Va. 2011). There, the court found that an apartment owner's failure to use paint without a volatile organic compound did not establish that plaintiff was denied reasonable accommodations. *Id.* In doing so, the court provided three factors to help guide the FHA discrimination inquiry. First, "in order for an accommodation to be reasonable it must be both efficacious and proportional to the costs to implement it." *Id.* In addition, "there must be a direct linkage between the proposed accommodation and the equal opportunity to be provided." *Id.* Next, "the 'equal opportunity' element limits the

accommodation duty such that not every practice that creates a general inconvenience or burden on the person with a handicap needs to be modified." *Id.*

The parties dispute whether Plaintiff has a handicap, but Defendants do not spend much time contesting this fact given the functional definition of "handicap" contained in 42 U.S.C. § 3602(h)(1). Indeed, at this stage, because Plaintiff quit his job, stopped attending classes, and postponed taking the bar exam, it appears that he has sufficiently alleged a handicap that "substantially limits one or more of such person's major life activities." At this point in the litigation, the Court assumes, without deciding, that Plaintiff has a handicap for the purposes of the FHA.

To properly assess the alleged accommodation, it is useful to recall Plaintiff's precise requests. He requested: (1) that Defendants provide him with 24-hour notice before performing maintenance; and (2) that the maintenance work not be done until the week following April 15, 2015. It is also possible to construe his request to terminate his lease as an "accommodation." None of these requests qualify as a reasonable accommodation under the FHA.

First and foremost, Plaintiff did not request *any* accommodation prior to April 15, 2015. Thus, the requested accommodation could have only applied from that day forward. Because Hired Vendor never entered Plaintiff's apartment without permission after the initial entry, the 24-hour notice "accommodation" was satisfied completely. Plaintiff's claim for denial of this "accommodation" could therefore be resolved on this basis alone.

Additionally, as the parties make clear, the 24-hour notice requirement is provided by Virginia law. *See* Va. Code § 55-255.34(A), *as amended by* LANDLORD AND TENANT, 2017 Virginia Laws Ch. 730 (H.B. 2033) (effective March 24, 2017) ("Unless impractical to do so, the landlord shall give the tenant at least 24 hours' notice of routine maintenance to be

8

performed that has not been requested by the tenant."). Thus, this request is not specific to Plaintiff's handicap. Indeed, Plaintiff concedes that "defendants could have made reasonable accommodations by simply adhering to the terms of the lease agreement." Opp'n at 6 (Dkt. No. 25). As such, there can be no "direct linkage" between the Plaintiff's handicap and the requested "accommodation" because the 24-hour notice provision applies to every resident, whether handicapped or not. *Matarese*, 761 F. Supp. 2d at 364. Because this "accommodation" is a statutory requirement, the remedy for its violation lies in Virginia's "statutory scheme governing *contractual relationships* between landlords and tenants." *Isbell v. Commercial Inv. Assocs., Inc.*, 273 Va. 605, 614 (2007) (explaining and applying the Virginia Residential Landlord and Tenant Act). The FHA simply does not support this claim.

Similarly, the one-week delay in maintenance is not a reasonable "accommodation" that affects the use and enjoyment of Plaintiff's apartment under the FHA. As an initial matter, this proposed accommodation is incongruous with Plaintiff's handicap. As alleged by Plaintiff, he suffered his concussion on February 5, 2015, and it caused him to quit his job, reject another job offer, stop taking classes, and defer sitting for the bar exam. If true, these effects on Plaintiff's life are unfortunate and serious. However, it is entirely unclear how a week-long period of isolation in mid-April can be logically linked to the concussion more than two months earlier. In particular, it is difficult to see how a period of 10 weeks was insufficient to alleviate his concussion symptoms, but somehow extending the time period by one week fixed his ongoing symptoms. In other words, Plaintiff's reasonableness argument suffers from a significant gap in temporal logic. Accordingly, Plaintiff has not shown how the alleged accommodation was reasonably linked to his handicap.

Moreover, if Plaintiff's pain and suffering, "fight or flight" reactions, and physical aching of his brain were caused by individuals knocking on the door, it is unclear why Plaintiff did not allow the maintenance personnel into his apartment. This would have removed the fear of someone entering unannounced and would have prevented Hired Vendor from knocking on his door throughout the day. In short, the best possible "accommodation" would have been permission to enter Plaintiff's apartment. To further prove this point, the maintenance man eventually did come to his apartment the next week and apparently completed the maintenance without event. The logic of this analysis is reinforced because Plaintiff admits that he was able to leave his home on the same day. Therefore, he was not bedridden or incapacitated. He simply did not wish to be bothered. Because "not every practice that creates a general inconvenience or burden on the person with a handicap needs to be modified," Plaintiff's complaint does not rise to the level of an accommodation under the FHA. *Matarese*, 761 F. Supp. 2d at 364.

### B. Count II: FHA Retaliation

To state a claim for FHA retaliation, a plaintiff must prove four elements: "(1) the plaintiff was engaged in protected activity; (2) the defendant was aware of that activity; (3) the defendant took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action." *Costello v. Malcolm*, No. 5:12CV00025, 2012 WL 2527019, at *5 (W.D. Va. June 29, 2012) (internal citations and quotations omitted).

In this case, the alleged protected activity was the request for an "accommodation" which, as discussed above, is not cognizable under the FHA. Therefore, there is no protected activity upon which to retaliate, and Count II must fail.

## C. Count III: Hostile Environment Harassment

Plaintiff's hostile environment harassment claim is based on 24 C.F.R. § 100.600, which prohibits:

> unwelcome conduct that is sufficiently severe or pervasive as to interfere with: The availability, sale, rental, or use or enjoyment of a dwelling; the terms, conditions, or privileges of the sale or rental, or the provision or enjoyment of services or facilities in connection therewith; or the availability, terms, or conditions of a residential real estate-related transaction.

24 C.F.R. § 100.600. The existence of a hostile environment is determined by a totality of the circumstances, which includes "the nature of the conduct, the context in which the incident(s) occurred, the severity, scope, frequency, duration, and location of the conduct, and the relationships of the persons involved." *Id.*; *see also Harris v. Forklift Systems*, 510 U.S. 17, 23 (1993).

"[T]he Fourth Circuit recognizes that Title VII and Title VIII share the same central 'anti-discrimination objectives' and has treated doctrine regarding the definition of discrimination under Title VII and Title VIII as largely interchangeable." *Fahnbulleh v. GFZ Realty, LLC*, 795 F. Supp. 2d 360, 363 (D. Md. 2011) (*Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1065 (4th Cir. 1982)). In the "hostile environment" inquiry, the examination of severity and pervasiveness contains both subjective and objective inquiries. *See E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). In this regard, the FHA is not to be construed as a "general civility code[]" that prevents rude or undesirable behavior. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Thus, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not" rise to the level of a hostile environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted).

Plaintiff's allegations do not amount to a hostile housing environment. In summary, Plaintiff alleges that Defendants: (1) entered his apartment without permission; (2) banged on his door on multiple occasions; (3) told Plaintiff they could enter his apartment whenever they want; (4) demanded entry to Plaintiff's apartment; (5) rode on the elevator and pressured Plaintiff to let him into the apartment; (6) and laughed when Plaintiff told management that he was naked when Hired Vendor entered the apartment.

To begin, the duration of this conduct is extremely limited; these acts largely occurred only on April 15, 2015. This temporal limit cuts strongly against any argument for a hostile environment because isolated incidents cannot rise to the level of a hostile environment unless they are significantly more serious than the allegations put forth in Plaintiff's Complaint. Accordingly, the Court finds that Plaintiff's allegations do not constitute a hostile *environment*, but more appropriately represent a single bad day that involved disagreements with Defendants' property management services.

Moreover, only the laughing incident is even remotely tied to his handicap. The other incidents may have offended or inconvenienced Plaintiff, but they cannot be conceivably interpreted as discriminatory because they only relate to accessing Plaintiff's apartment, and not to his handicap itself. Indeed, all of the incidents set forth in the Complaint simply suggest that Post's management was attempting to schedule maintenance for Plaintiff's apartment. Defendants behaved improperly by harassing Plaintiff and laughing at him after Hired Agent was chased away from the apartment. But while these incidents may have been "simple teasing," they cannot be seen as objectively altering the conditions of his housing. In other words, these actions were uncivil, but they do not amount to a "severe and pervasive" hostile environment as required to state a claim of discrimination under the FHA.

D.  **Count IV: Intentional Infliction of Emotional Distress**

In Virginia, the tort of intentional infliction of emotional distress ("IIED") contains four elements: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous or intolerable; (3) there was a causal connection between the conduct and the resulting emotional distress; and (4) the emotional distress was severe. *Almy v. Grisham*, 273 Va. 68, 77 (2007) (citing *Womack v. Eldridge*, 215 Va. 338 (1974)). The Court need only look to the second of these elements to determine that Plaintiff has not stated a claim for relief.

The "outrageousness" standard is an objective one. *Id.* In order to qualify as outrageous, a defendant's act must offend "generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved." *Ruth v. Fletcher*, 237 Va. 366, 368 (1989) (citing *Womack*, 215 Va. 338)). The "outrageous" prong is a very high standard. *See id.* In this respect, the Virginia Supreme Court has assumed, without deciding, that calling someone 5.6 times per day for a period of two months qualified as outrageous. *Russo v. White*, 241 Va. 23, 27 (1991). In addition, the court has held that a defendant was liable for IIED when she posed as a journalist to obtain a photo of a defendant in the defendant's house to be used in a child molestation trial, when the defendant was not reasonably considered a suspect. *Womack*, 215 Va. at 340.

On the other hand, a defendant calling someone "a God damned woman, a God damned liar, and [telling her] that if he were there he would break her God damned neck," does not rise to the level of outrageous conduct. *See* Restatement (Second) of Torts § 46(d) (1965), illus. 4. Similarly, Virginia courts have held that a plaintiff's allegations that "she was intentionally inundated over a lengthy and continuous period of time with offensive and graphic sexual

suggestions, comments, innuendoes, and offensive touchings" did not rise to the level of outrageous. *Flanary v. Roanoke Valley Soc. for Prevention of Cruelty to Animals*, 48 Va. Cir. 249 (1999). Nor did the Circuit Court of Bath County find defendant's conduct to be outrageous when an employee gave a key to plaintiff's acquaintances "in the middle of the night without first obtaining sufficient identification or requesting the Plaintiffs' permission or at least providing Plaintiffs with sufficient warning, [was] fundamentally inadequate to reach the level of harm necessary to fulfill this component of the cause of action at issue." *Chilton v. Homestead, L.C.*, 79 Va. Cir. 708 (2008); *see also Dwyer v. Smith*, 867 F.2d 184, 194–95 (4th Cir. 1989) (finding that sexual comments, accusations of sexual relations with employees, and delivery of pornography to plaintiff were insufficient to prove outrageous conduct by the defendant).

Put differently:

The liability [for IIED] clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

Restatement (Second) of Torts § 46(d) (1965).

Based on this objective standard, Defendants' acts do not even approach a level of legal outrageousness. The worst example of Defendants' inappropriate behavior is the allegation that Hired Vendor rode the elevator with Plaintiff only to berate him and to coerce him into granting him access to his apartment. This may have been unpleasant for Plaintiff, and it may have been quite rude of the Hired Vendor, but it does not compare to calling someone "a God damned liar" or threatening them with a broken neck, a threat which would objectively cause a greater level of

14

fear than a repairman demanding to perform maintenance. The same analysis applies when this case is compared to the continuous sexual advances, unwanted touchings, and offensive portrayals that the court in *Flanary* found to be insufficient.

In sum, Plaintiff's allegations of outrageousness are not measured by his "supersensitive" status. They are instead tested against general societal standards, which allow the "freedom to express an unflattering opinion, and some safety valve . . . through which irascible tempers may blow off relatively harmless steam." Restatement (Second) of Torts § 46(d).

### E. Count V: Negligent Infliction of Emotional Distress

"The standard for negligent infliction of emotional distress ["NIED"] is even more rigorous than the standard for intentional infliction of emotional distress." *Zaklit v. Glob. Linguist Sols., LLC*, No. 1:14CV314 JCC/JFA, 2014 WL 3109804, at *16 (E.D. Va. July 8, 2014). In order to state a claim for NIED where there is no physical contact, a plaintiff must plead that the defendants' actions caused both emotional disturbance and physical injury. *Id.* He must also allege "actual physical injury as 'the natural result of fright or shock proximately caused by the defendant's negligence.'" *Zaklit v. Glob. Linguist Sols., LLC*, No. 1:14CV314 JCC/JFA, 2014 WL 3109804, at *16 (E.D. Va. July 8, 2014) (quoting *King v. City of Chesapeake*, 478 F. Supp. 2d 871, 874 (E.D. Va. 2007)). Interpreting this standard, the Virginia Supreme Court has held that allegations of verbal abuse from a psychologist were insufficient to state a NIED claim when they caused "severe psychological trauma and mental anguish affecting her mental and physical well-being," as well as "nightmares, difficulty sleeping, extreme loss of self-esteem and depression." *Harris v. Kreutzer*, 271 Va. 188, 204–05 (2006). Instead, the suffering must be "so severe that no reasonable person could be expected to endure it." *Id.* at 205.

As a principal matter, Plaintiff cannot tie any of his physical injuries to Defendant's conduct, and his claim therefore fails to allege the fundamental element of proximate causation. Plaintiff alleges that Defendants' entry into his home and knocks on his door caused his brain to ache, but Plaintiff's own evidence rebuts the assertion that Defendant's conduct caused this injury. Specifically, the March 27, 2015 medical progress report submitted with the Complaint details a "headache . . . from concussion Feb. 5th." Compl. Ex. 5. It further states that "static noise triggers headache. Strain/Exercise [increases] intense headache . . . headaches still occur daily. Headaches rated 6-9/10." *Id.* (grammar original). Thus, any headaches that pained Plaintiff were evidently the result of his concussion, which happened more than two months before the Defendants' actions on April 15, 2015. As such, Plaintiff cannot show that Defendants actually *caused* his physical ailments because those ailments existed as of March 27, more than two weeks before Defendants' entry into his home.

Moreover, even if he could show causation, Plaintiff's alleged injuries do not rise to the level necessary to show legally cognizable "emotional distress." He alleges that the entry into his home caused "severe emotional distress triggering a fight-or-flight response, resulting in his brain physically aching because plaintiff reasonably believed he was having his apartment broken into causing plaintiff to reasonably fear for his life." Compl. ¶ 20. The only physical injury here is Plaintiff's headache. Although this was undoubtedly unpleasant, it cannot be said that Plaintiff's headache is "so severe that no reasonable person could be expected to endure it." *Harris*, 271 Va. at 205. This is further supported by the fact that Defendant's April 20, 2015 medical report makes no mention of the incident, but rather records Defendant's description of the headache as having "a permanent hangover." Compl., Ex. 6. If the pain caused by Defendants was truly unbearable, Plaintiff would have undoubtedly mentioned that fact to his

16

doctors. Instead, the cause of the headaches is still listed as the "car accident on February 5, 2015." *Id.*

F.  **Count VI: Negligence**

Plaintiff alleges that Defendants breached "a duty of reasonable care" to provide him with a 24-hour notice before entering his apartment. Contrary to Plaintiff's assertions, the 24-hour notice rule does not come from the common law, but rather from Virginia's statutory scheme. Therefore, this argument is soundly foreclosed by the Virginia Supreme Court, which has stated:

> [T]he General Assembly did not plainly manifest an intention, either through express language or by necessary implication, to abrogate the common law and make a landlord liable in tort for a tenant's personal injuries sustained on leased premises within the tenant's control and possession as a result of the landlord's breach of duties imposed by the Act. Instead, the Act provides a comprehensive scheme of landlords' and tenants' contractual rights and remedies.

*Isbell v. Commercial Inv. Assocs., Inc.*, 273 Va. 605, 618 (2007). In other words, the Act does not abrogate common law duties; however, where it applies, the procedures in the act provide the sole remedy for aggrieved landlords and tenants. *See id.* Therefore, as discussed in more detail above, Plaintiff's claims may sound in contract, but they do not sound in negligence, and they therefore must be dismissed.

G.  **Count VII: Trespass**

Plaintiff's trespass claim suffers the same fate for the same reasons. Virginia Code Section 55-248.10:1 provides:

> If the landlord makes an unlawful entry or a lawful entry in an unreasonable manner or makes repeated demands for entry otherwise lawful but which have the effect of unreasonably harassing the tenant, the tenant may obtain injunctive relief to prevent the recurrence of the conduct, or terminate the rental agreement.

17

Va. Code Ann. § 55-248.10:1. Thus, the remedies for a trespass action as alleged in this Complaint are preempted by the terms of the VRLTA, which provides the sole remedy for Plaintiff's Complaint.

### H. Count VIII: Breach of the Implied Covenant of Quiet Enjoyment

Generally, the implied covenant of quiet enjoyment "obligates the lessor of real estate to avoid substantial interference with the lessee's beneficial use or enjoyment of the leased premises." Richard Link, *Cause of Action for Breach of Covenant of Quiet Enjoyment of Leased Premises*, 29 Causes of Action 2d 511 (Originally published in 2005). In this regard, the covenant protects a tenant's right to "freedom from serious interference with the tenancy"; or, freedom from "acts or omissions that impair the character and value of the leased premises." *Id.*

Virginia courts have equated the covenant of quiet enjoyment with the doctrine of constructive eviction. *Nottingham Assocs. v. Christian*, 29 Va. Cir. 175 (Va. Cir. Ct. 1992) (discussing cases where excessive and consistent noise from neighbors constituted a breach of the covenant where the landlord did not take action); *Moore v. Ladd Furniture*, 22 Va. Cir. 249 (Va. Cir. Ct. 1990) (stating that breach of the covenant of quiet enjoyment "is premised on actual or constructive eviction . . . [which] occurs when actual possession of the property is in a third party with paramount title on the date of conveyance.").

Simply put, Count VIII completely misses the mark. Although Plaintiff argues that the "facts alleged were sufficient to support the claim that defendants deprived plaintiff of the ability to possess or occupy the premises," this assertion does not hold water. As discussed in more detail above, the facts alleged here do not rise to any level of objective seriousness. In particular: (1) the events occurred primarily on a single day and completely ceased after one week; (2) nobody entered Plaintiff's apartment without permission after April 15, 2015; (3) there is no

covenant that prevents individuals from knocking on a door during reasonable daytime hours; and (4) Defendants had a perfectly reasonable purpose for entering Plaintiff's apartment. To hold that this constitutes a breach would stretch the fabric of the covenant of quiet enjoyment beyond its breaking point by allowing a single day of noise or inconvenience to establish a constructive eviction. The Court is unwilling to take that step.

### I. Count IX: Nuisance in Fact

A nuisance is, "the using, or authorizing the use of, one's property, or of anything under one's control, so as to injuriously affect an owner or occupier of property (1) by diminishing the value of that property; (2) by continuously interfering with his power of control or enjoyment of that property; [or] (3) by causing material disturbance or annoyance to him in his use or occupation of that property." *Adams v. Star Enterprises*, 851 F. Supp. 770, 773 (E.D. Va. 1994) (citing *Virginian Railway Co. v. London*, 114 Va. 334, 334–35 (1912)). A nuisance must be a recurring condition. *See Bragg v. Ives*, 149 Va. 482 (1927); *see also Cooper v. Horn*, 248 Va. 417 (1994). In addition, "[t]he annoyance complained of must be something real, substantial and tangible - one that affects the normal person, *not the over-nervous or supersensitive*, nor yet the hardened and stoical, but the ordinary man, with ordinary sensibilities, tastes and feelings." *Bragg*, 149 Va. at 495–96 (emphasis added).

Plaintiff's allegations of garbage room doors closing and knocks on his door cannot possibly be considered "substantial and tangible." Indeed, Virginia law makes clear that the doctrine of nuisance is not directed to the "supersensitive," a word that Plaintiff uses to describe himself. *Id.* Moreover, as discussed above, the events detailed in the Complaint take place largely in the course of one day. Though the maintenance did not occur until the following week, the unlawful entry, knocks on the door, and conversations with Blackman all took place on

April 15, 2015. They therefore are not continuous, even if they were substantial enough to state a claim.

### J. Count X: Invasion of Privacy

Virginia courts do not recognize a common law cause of action for invasion of privacy. *Hayes v. KIK Custom Prod.*, No. 7:11-CV-00200, 2011 WL 4963774, at *1 (W.D. Va. Oct. 14, 2011). Indeed, Plaintiff concedes that "Virginia state law does not expressly recognize a civil cause of action for invasion of privacy." Opp'n at 20 (Dkt. No. 25). Accordingly, this claim has no merit and must be dismissed.

### IV. CONCLUSION

Plaintiff's claims rely on an overbroad understanding of the "eggshell" plaintiff rule. That rule relates to damages. The substantive violations are governed by objective legal principles that are not satisfied by Plaintiff's "supersensitive" status. Accordingly, the Court hereby **GRANTS** Defendants' motions to dismiss in full. Because Plaintiff is a barred attorney who has already amended his complaint once after a prior set of briefing, it appears any further amendment would be futile, and the Complaint is hereby **DISMISSED WITH PREJUDICE**. An appropriate order shall issue.

Liam O'Grady
United States District Judge

June 22, 2017
Alexandria, Virginia